IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

ORCKIT CORPORATION,

       Plaintiff,

  v.

CISCO SYSTEMS, INC.,

       Defendant.

Civil Action No. 2:22-cv-276

<u>JURY TRIAL DEMANDED</u>

## **COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Orckit Corporation ("Orckit" or "Plaintiff") submits this complaint for patent infringement against Defendant Cisco Systems, Inc. ("Cisco" or "Defendant"), requests a trial by jury, and alleges the following upon actual knowledge with respect to itself and its own acts and upon information and belief as to all other matters:

## **NATURE OF ACTION**

1.      This is an action for patent infringement.  Orckit alleges that Cisco infringes U.S. Patents Nos. 6,680,904 ("the '904 Patent"), 7,545,740 ("the '740 Patent"), 8,830,821 ("the '821 Patent"), and 10,652,111 ("the '111 Patent") (collectively, "the Asserted Patents"), copies of which are attached hereto.

2.      Orckit alleges that Cisco: (1) directly and indirectly infringes the Asserted Patents by making, using, offering for sale, selling, and importing certain networking hardware and software; (2) induces infringement of the Asserted Patents and contributes to others' infringement of the Asserted Patents; and (3) infringes the Asserted Patents willfully. Orckit seeks damages and other relief for Cisco's wrongful conduct.

## PARTIES

3.      Orckit is a Delaware Corporation and owns the Asserted Patents by assignment.

4.      Cisco is a Delaware corporation with its principal place of business at 170 West Tasman Drive, San Jose, California 95134.

5.      Cisco is registered to do business in Texas, maintains places of business in Texas, and conducts business in Texas.  Cisco has at least two places of business in this district, including a multi-building campus with over 1,400 employees at 2250 East President George Bush Turnpike, Richardson, Texas 75082, and a 162,000 square foot data center at 2260 Chelsea Blvd., Allen, Texas 75013.  The Collin County Appraisal District appraised these facilities at a combined value over $300,000,000.

6.      Cisco has a permanent and continuous presence in Texas and a regular and established place of business in the Eastern District of Texas.

## JURISDICTION AND VENUE

7.      This action arises under the patent laws of the United States, 35 U.S.C. § 271 *et seq*. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

8.      The Court has personal jurisdiction over Cisco.  As alleged above, Cisco has sufficient minimum contacts with Texas so that this action does not offend due process or the traditional notions of fair play and substantial justice and so that Texas's long-arm statute is satisfied.  Among other factors, Cisco is registered in Texas, is domiciled in this district, and has a continuous presence in and systematic contact with this district.  Specifically, Cisco regularly conducts business at its facilities in Richardson and Allen and derives substantial revenue from the goods and services that it provides to its customers in Texas.  Cisco also undertakes a portion of its infringing activities in Texas—including by making, using, importing, offering for sale,

and selling products and services that infringe the Asserted Patents—directly and through its distributors, retailers, and other intermediaries.

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§1391(b), (c), (d) and 1400(b) because Cisco has a permanent and continuous presence in, has committed acts of infringement in, and maintains a regular and established place of business in this district.

## FACTUAL ALLEGATIONS

### *Orckit Communications Ltd. and Its Breakthrough Communications Technology*

10.      The patented technology is rooted in research by Orckit Communications Ltd. (later reorganized and renamed Orckit-Corrigent Ltd.), a company founded in Israel in 1990 by Izhak Tamir.  The company was a pioneer in the development of infrastructure-level networking products, and in its first decade became the market leader in Asymmetric Digital Subscriber Line (ADSL) technology, winning a client base that included some of the world's preeminent telecommunications providers.  The company went public, and in 1996 was listed in the United States on the Nasdaq Stock Exchange.

11.      Building from that initial success, Orckit Communications Ltd. turned its attention to overcoming significant limitations in Ethernet, the predominant technology used for local area networks used in offices, schools and other local environments.  With the proliferation of data and the development of the Internet, demand for the data transmission skyrocketed. While Ethernet could be used to connect a limited number of computers, it was not well suited to the delivery of video, voice, and other applications with higher bandwidth requirements for a larger number of users.  The existing standard for delivering voice communications, known as the Synchronous Optical Network ("SONET") protocol, was not a viable alternative because it was not designed to process data in an efficient and scalable way.  As a result, providers like

cable companies were required to develop and install their own infrastructure to deliver services and could not rely on a single network to provide different services in parallel.

12.     Orckit Communications Ltd.'s solutions addressed those shortcomings.  It quickly recognized that existing solutions could accommodate network traffic only so long as data occupied only a small portion of overall network traffic.  The company's technology overcame those limitations by enhancing Ethernet switching and routing to optimize the transmission of data, voice and video, including those using Internet Protocol ("IP") telecommunications networks.  The capacity, reliability, and resilience offered by Orckit Communications Ltd.'s inventions opened up the possibility of the transmission of data, voice, and video services on the same network—the hugely valuable "bundled services" or "triple-play services" sought by both telecommunications companies and their customers.

13.     Between 2000 and 2010, Orckit Communications Ltd. invested hundreds of millions of US dollars in research and development of those solutions.  It earned recognition around the world for those innovations and won contracts to rebuild national telecommunications infrastructure systems along with hundreds of patents—including those at issue in this lawsuit.

14.      With the economic downturn of 2007 and 2008, many of Orckit Communications Ltd.'s most significant potential customers dramatically reduced their infrastructure spending. Even with its superior technology the company was unable to weather the global recession and ultimately went into liquidation.

15.     Plaintiff Orckit Corporation obtained all rights in the Asserted Patents.

*The Asserted Patents*

**U.S. Patent No. 6,680,904**

16.     Orckit is the lawful owner of all rights, title and interest in U.S. Patent No. 6,680,904 ("the '904 Patent") entitled "BI-DIRECTIONAL CHAINING OF NETWORK ACCESS PORTS" (attached as Exhibit 1), including the right to sue and recover for infringement thereof.  The '904 Patent was duly and legally issued on January 20, 2004, naming Menachem Kaplan, David Zelig, Roy Kinamon, Eli Aloni, Ron Sdayoor, Eric Paneth and Eli Magal as the inventors.

17.     The '904 Patent has 26 claims: 6 independent claims and 20 dependent claims.

18.     The '904 Patent presented novel and unconventional apparatuses and methods for (among other things) "efficient, high-speed transfer of data packets within an access multiplexer system." Ex. 1, '904 Patent at 1:65-67. The inventions patented in the '904 Patent include, for example, "slave" and "master" units that are "connected in one or more daisy chains between the active and standby masters and are configured so that both downstream and upstream packets can be transmitted in either direction along each of the chains." *Id.* at 2:11-14. Thus, "if a failure occurs in any one of the slaves or in a link between them, the traffic direction in the chain in which the failure has occurred is simply reversed so as to run through the standby master." *Id*. at 2:15-18. "An advantage of the architecture of system 31 is that additional slaves may be added to the chains as needed, without having to change the number of interfaces associated with masters 30, and 32." *Id*. at 6:33-36 One embodiment of the inventions of the '904 Patent is shown in Fig. 3, reproduced below:

FIG. 3

19.    The claims of the '904 Patent, including claim 1 (reproduced below), recite at least these inventive concepts of the '904 Patent:

1. Network access apparatus, comprising:

first and second master units, each comprising a physical interface to a packet-switched network;

a plurality of slave units, each slave unit comprising one or more ports to respective subscriber lines; and

a plurality of physical interface lines, which link the slave units in one or more daisy chains, in which the slave units are mutually connected in series by the physical interface lines therebetween, each daisy chain comprising at least a first slave unit connected one of the physical interface lines to the first master unit, a second slave unit connected to the first slave unit but not to the first or second master unit, and a last slave unit connected by another of the physical interface lines to the second master unit.

*Id.* at 11:41-55 (claim 1).

20.    The subject matter described and claimed in the '904 Patent, including the subject matter of claim 1, represented an improvement in computer and communications functionality, performance, and efficiency, and was novel and not well-understood, routine, or conventional at the time of the invention of the '904 Patent.

6

21.     Cisco had knowledge of the '904 Patent, including at least as of March 2017 when Orckit IP LLC ("Orckit IP")—a prior owner of the Asserted Patents—initiated discussions with Cisco about its patent portfolio, including the Asserted Patents, as described and alleged below, and at least as of the filing of this Complaint.

**U.S. Patent No. 7,545,740**

22.     Orckit is the lawful owner of all right, title, and interest in U.S. Patent No. 7,545,740 ("the '740 Patent") entitled "TWO-WAY LINK AGGREGATION" (attached as Exhibit 2), including the right to sue and recover for infringement thereof. The '740 Patent was duly and legally issued on June 9, 2009, naming David Zelig, Ronen Solomon, and Uzi Khill as the inventors.

23.     The '740 Patent has 31 claims: 12 independent claims and 19 dependent claims.

24.     The '740 Patent presented novel and unconventional apparatuses and methods for (among other things) "connecting users to a communication network with increased capacity and use of service." Ex. 2, '740 Patent at 1:39-41. The inventions patented in the '740 Patent, for example, distribute data frames among "parallel physical links, so as to balance the traffic load among the links," a process that in turn enables the network to "deliver a higher bandwidth at a given [quality of service ('QoS')] or to improve the QoS at a given bandwidth." *Id.* at 1:48-55. The patented "load balancing operation in embodiments of the present invention enables statistical multiplexing of the frames, in which there is no direct relationship or connection between user ports and backplane traces." *Id.* at 2:1-4. Furthermore, "[i]n some embodiments, two or more physical user ports are aggregated into a [link aggregation] group external to the network element, so as to form an aggregated user port having a higher bandwidth." *Id.* at 2:5-8. One embodiment of the inventions of the '740 Patent is shown in Fig. 2, reproduced below:



25.    The claims of the '740 Patent, including claim 17 (reproduced below), recite at least these inventive concepts of the '740 Patent:

17. Apparatus for connecting a network node with a communication network, comprising:

one or more interface modules, which are arranged to process data frames having frame attributes sent between the network node and the communication network, at least one of said interface modules being operative to communicate in both an upstream direction and a downstream direction;

a first group of first physical links arranged in parallel so as to couple the network node to the one or more interface modules;

a second group of second physical links arranged in parallel so as to couple the one or more interface modules to the communication network; and

a control module, which is arranged to select for each data frame sent between the communication network and the network node, in a single computation based on at least one of the frame attributes, a first physical link out of the first group and a second physical link out of the second group over which to send the data frame;

at least one of said first physical links and at least one of said second links being bi-directional links operative to communicate in both said upstream direction and said downstream direction.

*Id.* at 13:35-58 (claim 17).

26.    The subject matter described and claimed in the '740 Patent, including the subject matter of claim 17, represented an improvement in computer and communications functionality,

performance and efficiency, and was novel and not well-understood, routine, or conventional at the time of the invention of the '740 Patent.

27.    Cisco had knowledge of the '740 Patent, including at least as of March 2017 when Orckit IP LLC ("Orckit IP")—a prior owner of the Asserted Patents—initiated discussions with Cisco about its patent portfolio, including the Asserted Patents, as described and alleged below, and at least as of the filing of this Complaint.

**U.S. Patent No. 8,830,821**

28.    Orckit is the lawful owner of all right, title, and interest in U.S. Patent No. 8,830,821 ("the '821 Patent") entitled "METHOD FOR SUPPORTING MPLS TRANSPORT PATH RECOVERY WITH MULTIPLE PROTECTION ENTITIES" (attached as Exhibit 3), including the right to sue and recover for infringement thereof. The '821 Patent was duly and legally issued on September 9, 2014, naming Daniel Cohn and Rafi Ram as the inventors.

29.    The '821 Patent has 20 claims: 3 independent claims and 17 dependent claims.

30.    The '821 Patent presented novel and unconventional apparatuses and methods for (among other things) selecting network transport entities between a first and second endpoint, using working and protection entities to minimize simultaneous failure and/or a cost function. Ex. 3, '821 Patent, at Abstract; 2:5-21. The inventions patented in the '821 Patent, for example, switch between working and protection entities, determine a probability of concurrent failure of both entities, and reselect an entity pair. *Id.* at 2:32-43. One embodiment of the inventions of the '821 Patent is shown in Fig. 1, reproduced below:



31.    The claims of the '821 Patent, including claim 14 (reproduced below), recite at least these inventive concepts of the '821 Patent:

14. A system for selecting entities within an MPLS network, comprising:

a data structure comprising a plurality of transport entity descriptors;

an entity protection switch configured to switch between a working entity and a protection entity; and

digital logic configured to select said working entity and said protection entity from said plurality of transport entity descriptors, comprising: logic configured to determine a probability of concurrent failure of said working entity and said protection entity;

logic configured to determine an entity cost of said plurality of transport entity descriptors; and

logic configured to reselect said working entity and said protection entity from said plurality of transport entity descriptors upon a reselection event,

wherein said reselection event is selected from a group consisting of adding an entity to said plurality of transport entities, removing an entity from said plurality of transport entities, an operational status change for one of said plurality of transport entities, and a change in over all cost for one of said plurality of transport entities.

*Id.* at 8:42-63 (claim 14).

32.    The subject matter described and claimed in the '821 Patent, including the subject matter of claim 14, represented an improvement in computer and communications functionality, performance and efficiency, and was novel and not well-understood, routine, or conventional at the time of the invention of the '821 Patent.

33.    Cisco had knowledge of the '821 Patent, including at least as of March 2017 when Orckit IP LLC ("Orckit IP")—a prior owner of the Asserted Patents—initiated discussions with Cisco about its patent portfolio, including the Asserted Patents, as described and alleged below, and at least as of the filing of this Complaint.

**U.S. Patent No. 10,652,111**

34.    Orckit is the lawful owner of all right, title, and interest in U.S. Patent No. 10,652,111 ("the '111 Patent") entitled "METHOD AND SYSTEM FOR DEEP PACKET INSPECTION IN SOFTWARE DEFINED NETWORKS" (attached as Exhibit 4), including the right to sue and recover for infringement thereof. The '111 Patent was duly and legally issued on May 12, 2020, naming Yossi Barsheshet, Simhon Doctori and Ronen Solomon as the inventors.

35.    The '111 Patent has 54 claims: 2 independent claims and 52 dependent claims.

36.    The '111 Patent presented novel and unconventional methods for (among other things) "deep packet inspection (DPI) in a software defined network (SDN), wherein the method is performed by a central controller of the SDN." Ex. 4, '111 Patent at 2:28-30. As an example, unlike the prior art, the inventions patented in the '111 Patent enable the inspection or extraction of content from data packets belonging to a specific flow or session, thereby enabling security threat detection. *Id.* at 1:61-67. The patented inventions also decrease traffic delays between client and server, avoid overflowing the controller with data, and prevent the concentration of a

single point of failure for data traffic. *Id.* at 2:1-7. One embodiment of the inventions of the '111 Patent is shown in Fig. 1, reproduced below:



FIG. 1

37.    The claims of the '111 Patent, including claim 1 (reproduced below), recite at least these inventive concepts of the '111 Patent:

1. A method for use with a packet network including a network node for transporting packets between first and second entities under control of a controller that is external to the network node, the method comprising:

sending, by the controller to the network node over the packet network, an instruction and a packet-applicable criterion;

receiving, by the network node from the controller, the instruction and the criterion; receiving, by the network node from the first entity over the packet network, a packet addressed to the second entity;

checking, by the network node, if the packet satisfies the criterion;

responsive to the packet not satisfying the criterion, sending, by the network node over the packet network, the packet to the second entity; and

responsive to the packet satisfying the criterion, sending the packet, by the network node over the packet network, to an entity that is included in the instruction and is other than the second entity.

*Id.* at 10:51-11:4 (claim 1).

38.    The subject matter described and claimed in the '111 Patent, including the subject matter of claim 1, represented an improvement in computer and communications functionality, performance and efficiency, and was novel and not well-understood, routine, or conventional at the time of the invention of the '111 Patent.

39.    Cisco had knowledge of the '111 Patent, including at least as of the filing of this Complaint.

## BACKGROUND OF CISCO'S INFRINGING CONDUCT

40.    Defendant Cisco Systems Inc. is a computer networking company that makes, uses, sells, offers for sale in the United States, and/or imports into the United States, or has otherwise made, used, sold, offered for sale in the United States, and/or imported in the United States, routers, switches, and other networking equipment and software that infringe the Asserted Patents.

41.    Cisco's products that infringe the Asserted Patents (collectively, "Accused Products") include at least the following:

| Patent | Infringing Cisco Products |
|--------|---------------------------|
| '904 | Cisco 550X Series Stackable Managed Switches |
| '740 | Cisco Catalyst 6500 Series Switches |
| '821 | Cisco Network Convergence System 4000 Series |
| '111 | Cisco ASR 1000 Series Aggregation Services Routers |

The above-listed Accused Products are non-limiting.  Additional products may infringe the Asserted Patents, and the above-listed Accused Products may infringe additional patents or other Asserted Patents.

42.     Cisco infringes and continues to infringe the Asserted Patents by making, using, selling, offering to sell, and/or importing, without license or authority, the Accused Products as alleged herein.

43.     Cisco markets, advertises, offers for sale, and/or otherwise promotes the Accused Products and does so to induce, encourage, instruct, and aid one or more persons in the United States to make, use, sell, and/or offer to sell their Accused Products. For example, Cisco advertises, offers for sale, and/or otherwise promotes the Accused Products on its website.  Cisco further publishes and distributes data sheets, manuals, and guides for the Accused Products, as set forth in detail below.  Therein, Cisco describes and touts the use of the subject matter claimed in the Asserted Patents, as described and alleged below.

## BACKGROUND OF CISCO'S KNOWLEDGE OF THE INVENTIONS DESCRIBED AND CLAIMED IN THE ASSERTED PATENTS

44.     Cisco has had knowledge of the Asserted Patents and the inventions described and claimed therein since at least around March 2017, when Orckit IP—a prior owner of the Asserted Patents—initiated discussions with Cisco about the Asserted Patents and the Accused Products. On March 20, 2017 Orckit IP sent a letter to Cisco concerning its "Patent Portfolio." Ex. 5 ("March 2017 Letter from Orckit IP to Cisco"). In that letter, Orckit IP notified Cisco that it:

> …owns a patent portfolio related to certain communications technologies developed by Orckit Communications Ltd. and Corrigent Systems Ltd. (f/k/a Orckit-Corrigent Ltd.). Orckit IP's patent portfolio includes over 100 patents and pending patent applications. One or more of these patents and patent applications may be of interest to Cisco and require your company's attention.

Ex. 5 at 1.

45.     Orckit IP further identified several "Cisco switches and routers," including certain of the Accused Products, which are accused of infringing the Asserted Patents. *Id*. Orckit IP

concluded that "Cisco may be interested in obtaining a license to (or acquiring) the '983 Patent and/or other patent assets from Orckit IP's patent portfolio." *Id*. at 2.

46.    On April 10, 2017, Cisco responded by letter and requested additional information. Ex. 6 ("April 2017 Letter from Cisco to Orckit IP"). On July 11, 2018, Orckit IP sent a second notice letter to Cisco, again concerning its "Patent Portfolio." Ex. 7 ("July 2018 Letter from Orckit IP to Cisco").  Orckit IP again notified Cisco that Orckit IP's patent portfolio relates to Cisco's switch and router products and concluded that "Cisco may be interested in obtaining a license to (or acquiring) the '821 Patent, the '928 Patent, and/or other patent assets from Orckit IP's patent portfolio (in addition to the '983 Patent, discussed above)." Ex. 7 at 2.

47.    On July 25, 2018, Cisco responded by letter and requested additional information. Ex. 8 ("July 2018 Letter from Cisco to Orckit IP").

48.    On November 20, 2018, Orckit IP identified additional patents within its patent portfolio, including the asserted '904 Patent. Ex. 9 ("November 2018 Email from Orckit IP to Cisco"). Orckit IP offered to send Cisco exemplary "evidence of use charts" relating to any of the patents, including the asserted '904 patent. Ex. 9 at 2.

49.    Cisco has also had knowledge of the Asserted Patents and the inventions described and claimed therein since at least as of the filing of this Complaint.

## COUNT ONE: INFRINGEMENT OF U.S. PATENT 6,680,904

50.    Cisco directly infringes at least claim 1 of the '904 Patent by making, using, offering for sale, sold, and/or importing products, including at least the Accused Products, that meet every limitation, either literally or under the doctrine of equivalents, of at least claim 1 of the '904 Patent, in violation of 35 U.S.C. § 271(a).

51.    With knowledge of the '904 Patent, Cisco has actively induced and continues to induce the direct infringement of one or more claims of the '904 Patent, including claim 1, in violation of 35 U.S.C. § 271(b) by its customers and/or end users of their products, including at least the Accused Products, by selling, providing support for, providing instructions for use of, and/or otherwise encouraging its customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, one or more claims of the '904 Patent, including claim 1, with the intent to encourage those customers and/or end-users to infringe the '904 Patent.

52.    By way of example, Cisco actively induces infringement of the '904 Patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and end users who purchase, test, operate, and use Cisco's products, including at least the Accused Products, to make, use, sell, and/or offer to sell Cisco's products, including at least the Accused Products, in a manner that infringes at least one claim of the '904 Patent, including claim 1.

53.    As a result of Cisco's inducement of infringement, its customers and/or end users made, used, sold, or offered for sale, and continue to make, use, sell, or offer to sell Cisco's products, including the Accused Products, in ways that directly infringe one or more claims of the '904 Patent, including claim 1.  Cisco had actual knowledge of its customers' and/or end users' direct infringement at least by virtue of its sales, instruction, and/or otherwise promotion of Cisco's products, including the Accused Products, at least as of March 2017 when Orckit IP initiated discussions with Cisco about its patent portfolio, including the Asserted Patents, and no later than the filing of this Complaint.

54.    With knowledge of the '904 Patent, Cisco has willfully, deliberately, and intentionally infringed the '904 Patent, and continues to willfully, deliberately, and intentionally

infringe the '904 Patent. Cisco had actual knowledge of the '904 Patent and Cisco's infringement of the '904 Patent as set forth above. After acquiring that knowledge, Cisco directly and indirectly infringed the '904 Patent as set forth above. Cisco knew or should have known that its conduct amounted to infringement of the '904 Patent at least because Orckit IP notified Cisco of the '904 Patent and its infringement of the '904 Patent as set forth above.

55.     Cisco will continue to infringe the '904 Patent unless and until it is enjoined by this Court. Cisco, by way of its infringing activities, has caused and continues to cause Orckit to suffer damages in an amount to be determined, and has caused and is causing Orckit irreparable harm. Orckit has no adequate remedy at law against Cisco's acts of infringement and, unless it is enjoined from its infringement of the '904 Patent, Orckit will continue to suffer irreparable harm.

56.     Orckit is entitled to recover from Cisco damages at least in an amount adequate to compensate for its infringement of the '904 Patent, which amount has yet to be determined, together with interest and costs determined by the Court.

57.     Orckit has complied with the requirements of 35 U.S.C. § 287 with respect to the '904 Patent.

## COUNT TWO: INFRINGEMENT OF U.S. PATENT 7,545,740

58.     Cisco directly infringes at least claim 17 of the '740 Patent by making, using, offering for sale, sold, and/or importing products, including at least the Accused Products, that meet every limitation, either literally or under the doctrine of equivalents, of at least claim 17 of the '740 Patent, in violation of 35 U.S.C. § 271(a).

59.     With knowledge of the '740 Patent, Cisco has actively induced and continues to induce the direct infringement of one or more claims of the '740 Patent, including claim 17, in violation of 35 U.S.C. § 271(b) by its customers and/or end users of their products, including at

least the Accused Products, by selling, providing support for, providing instructions for use of, and/or otherwise encouraging its customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, one or more claims of the '740 Patent, including claim 17, with the intent to encourage those customers and/or end-users to infringe the '740 Patent.

60.     By way of example, Cisco actively induces infringement of the '740 Patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and end users who purchase, test, operate, and use Cisco's products, including at least the Accused Products, to make, use, sell, and/or offer to sell Cisco's products, including at least the Accused Products, in a manner that infringes at least one claim of the '740 Patent, including claim 17.

61.     As a result of Cisco's inducement of infringement, its customers and/or end users made, used, sold, or offered for sale, and continue to make, use, sell, or offer to sell Cisco's products, including the Accused Products, in ways that directly infringe one or more claims of the '740 Patent, including claim 17.  Cisco had actual knowledge of its customers' and/or end users' direct infringement at least by virtue of its sales, instruction, and/or otherwise promotion of Cisco's products, including the Accused Products, at least as of March 2017 when Orckit IP initiated discussions with Cisco about its patent portfolio, including the Asserted Patents, and no later than the filing of this Complaint.

62.     With knowledge of the '740 Patent, Cisco has willfully, deliberately, and intentionally infringed the '740 Patent, and continues to willfully, deliberately, and intentionally infringe the '740 Patent.  Cisco had actual knowledge of the '740 Patent and Cisco's infringement of the '740 Patent as set forth above. After acquiring that knowledge, Cisco directly and indirectly infringed the '740 Patent as set forth above. Cisco knew or should have known

that its conduct amounted to infringement of the '740 Patent at least because Orckit IP notified Cisco of the '740 Patent and its infringement of the '740 Patent as set forth above.

63.     Cisco will continue to infringe the '740 Patent unless and until it is enjoined by this Court. Cisco, by way of its infringing activities, has caused and continues to cause Orckit to suffer damages in an amount to be determined, and has caused and is causing Orckit irreparable harm. Orckit has no adequate remedy at law against Cisco's acts of infringement and, unless it is enjoined from its infringement of the '740 Patent, Orckit will continue to suffer irreparable harm.

64.     Orckit is entitled to recover from Cisco damages at least in an amount adequate to compensate for its infringement of the '740 Patent, which amount has yet to be determined, together with interest and costs determined by the Court.

65.     Orckit has complied with the requirements of 35 U.S.C. § 287 with respect to the '740 Patent.

## COUNT THREE: INFRINGEMENT OF U.S. PATENT 8,830,821

66.     Cisco directly infringes at least claim 14 of the '821 Patent by making, using, offering for sale, sold, and/or importing products, including at least the Accused Products, that meet every limitation, either literally or under the doctrine of equivalents, of at least claim 14 of the '821 Patent, in violation of 35 U.S.C. § 271(a).

67.     With knowledge of the '821 Patent, Cisco has actively induced and continues to induce the direct infringement of one or more claims of the '821 Patent, including claim 14, in violation of 35 U.S.C. § 271(b) by its customers and/or end users of their products, including at least the Accused Products, by selling, providing support for, providing instructions for use of, and/or otherwise encouraging its customers and/or end-users to directly infringe, either literally

and/or under the doctrine of equivalents, one or more claims of the '821 Patent, including claim 14, with the intent to encourage those customers and/or end-users to infringe the '821 Patent.

68.     By way of example, Cisco actively induces infringement of the '821 Patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and end users who purchase, test, operate, and use Cisco's products, including at least the Accused Products, to make, use, sell, and/or offer to sell Cisco's products, including at least the Accused Products, in a manner that infringes at least one claim of the '821 Patent, including claim 14.

69.     As a result of Cisco's inducement of infringement, its customers and/or end users made, used, sold, or offered for sale, and continue to make, use, sell, or offer to sell Cisco's products, including the Accused Products, in ways that directly infringe one or more claims of the '821 Patent, including claim 14. Cisco had actual knowledge of its customers' and/or end users' direct infringement at least by virtue of its sales, instruction, and/or otherwise promotion of Cisco's products, including the Accused Products, at least as of March 2017 when Orckit IP initiated discussions with Cisco about its patent portfolio, including the Asserted Patents, and no later than the filing of this Complaint.

70.     With knowledge of the '821 Patent, Cisco has willfully, deliberately, and intentionally infringed the '821 Patent, and continues to willfully, deliberately, and intentionally infringe the '821 Patent. Cisco had actual knowledge of the '821 Patent and Cisco's infringement of the '821 Patent as set forth above. After acquiring that knowledge, Cisco directly and indirectly infringed the '821 Patent as set forth above. Cisco knew or should have known that its conduct amounted to infringement of the '821 Patent at least because Orckit IP notified Cisco of the '821 Patent and its infringement of the '821 Patent as set forth above.

71.    Cisco will continue to infringe the '821 Patent unless and until it is enjoined by this Court. Cisco, by way of its infringing activities, has caused and continues to cause Orckit to suffer damages in an amount to be determined, and has caused and is causing Orckit irreparable harm. Orckit has no adequate remedy at law against Cisco's acts of infringement and, unless it is enjoined from its infringement of the '821 Patent, Orckit will continue to suffer irreparable harm.

72.    Orckit is entitled to recover from Cisco damages at least in an amount adequate to compensate for its infringement of the '821 Patent, which amount has yet to be determined, together with interest and costs determined by the Court.

73.    Orckit has complied with the requirements of 35 U.S.C. § 287 with respect to the '821 Patent.

## COUNT FOUR: INFRINGEMENT OF U.S. PATENT 10,652,111

74.    Cisco directly infringes at least claim 1 of the '111 Patent by making, using, offering for sale, sold, and/or importing products, including at least the Accused Products, that meet every limitation, either literally or under the doctrine of equivalents, of at least claim 1 of the '111 Patent, in violation of 35 U.S.C. § 271(a).

75.    With knowledge of the '111 Patent, Cisco has actively induced and continues to induce the direct infringement of one or more claims of the '111 Patent, including claim 1, in violation of 35 U.S.C. § 271(b) by its customers and/or end users of their products, including at least the Accused Products, by selling, providing support for, providing instructions for use of, and/or otherwise encouraging its customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, one or more claims of the '111 Patent, including claim 1, with the intent to encourage those customers and/or end-users to infringe the '111 Patent.

76.     By way of example, Cisco actively induces infringement of the '111 Patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and end users who purchase, test, operate, and use Cisco's products, including at least the Accused Products, to make, use, sell, and/or offer to sell Cisco's products, including at least the Accused Products, in a manner that infringes at least one claim of the '111 Patent, including claim 1.

77.     As a result of Cisco's inducement of infringement, its customers and/or end users made, used, sold, or offered for sale, and continue to make, use, sell, or offer to sell Cisco's products, including the Accused Products, in ways that directly infringe one or more claims of the '111 Patent, including claim 1.  Cisco had actual knowledge of its customers' and/or end users' direct infringement at least by virtue of its sales, instruction, and/or otherwise promotion of Cisco's products, including the Accused Products, at least as of March 2017 when Orckit IP initiated discussions with Cisco about its patent portfolio, including the Asserted Patents, and no later than the filing of this Complaint.

78.     With knowledge of the '111 Patent, Cisco has willfully, deliberately, and intentionally infringed the '111 Patent, and continues to willfully, deliberately, and intentionally infringe the '111 Patent.  Cisco had actual knowledge of the '111 Patent and Cisco's infringement of the '111 Patent as set forth above.  After acquiring that knowledge, Cisco directly and indirectly infringed the '111 Patent as set forth above.  Cisco knew or should have known that its conduct amounted to infringement of the '111 Patent at least because Orckit IP notified Cisco of the '111 Patent and its infringement of the '111 Patent as set forth above.

79.     Cisco will continue to infringe the '111 Patent unless and until it is enjoined by this Court.  Cisco, by way of its infringing activities, has caused and continues to cause Orckit to

suffer damages in an amount to be determined, and has caused and is causing Orckit irreparable harm. Orckit has no adequate remedy at law against Cisco's acts of infringement and, unless it is enjoined from its infringement of the '111 Patent, Orckit will continue to suffer irreparable harm.

80.    Orckit is entitled to recover from Cisco damages at least in an amount adequate to compensate for its infringement of the '111 Patent, which amount has yet to be determined, together with interest and costs determined by the Court.

81.    Orckit has complied with the requirements of 35 U.S.C. § 287 with respect to the '111 Patent.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Orckit hereby demands a jury trial on all issues triable to a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for entry of judgment for Orckit and against Cisco and enter the following relief:

a)    A judgment that Cisco has infringed and continues to infringe one or more claims of the Asserted Patents, namely U.S. Patents Nos. 6,680,904 ("the '904 Patent"), 7,545,740 ("the '740 Patent"), 8,830,821 ("the '821 Patent"), and 10,652,111 ("the '111 Patent").

b)    That Orckit recover all damages to which it is entitled under 35 U.S.C. § 284, but in no event less than a reasonable royalty;

c)    That Cisco be permanently enjoined from further infringement of the Asserted Patents;

d)    That Orckit, as the prevailing party, shall recover from Cisco all taxable costs of court;

e)  That Orckit shall recover from Cisco all pre- and post-judgment interest on the damages award, calculated at the highest interest rates allowed by law;

f)  That Cisco's conduct was willful and that Orckit should therefore recover treble damages, including attorneys' fees, expenses, and costs incurred in this action, and an increase in the damage award pursuant to 35 U.S.C. § 284;

g)  That this case is exceptional and that Orckit shall therefore recover its attorneys' fees and other recoverable expenses, under 35 U.S.C. § 285; and

h)  That Orckit shall recover from Cisco such other and further relief as the Court deems appropriate.


Dated: July 22, 2022                    Respectfully submitted,


                                        /s/ Michael Ng by permission Andrea
                                        Fair
                                        Michael Ng
                                        California State Bar No. 237915 (Lead
                                        Attorney)
                                        Daniel A. Zaheer
                                        California State Bar No. 237118
                                        Michael M. Rosen
                                        California State Bar No. 230964
                                        Gabriela M. Ruiz (Pro Hac Vice
                                        forthcoming)
                                        California State Bar No. 227110
                                        michael.ng@kobrekim.com
                                        daniel.zaheer@kobrekim.com
                                        michael.rosen@kobrekim.com
                                        gabriela.ruiz@kobrekim.com
                                        **KOBRE & KIM LLP**
                                        150 California Street, 19th Floor
                                        San Francisco, CA 94111
                                        Telephone: 415-582-4800
                                        Facsimile: 415-582-4811

T. John Ward, Jr.
Texas State Bar No. 00794818
E-mail: jw@wsfirm.com
Andrea L. Fair
Texas State Bar No. 24078488
E-mail: andrea@wsfirm.com
WARD, SMITH & HILL, PLLC
1507 Bill Owens Parkway
Longview, Texas 75604
(903) 757-6400 (telephone)
(903) 757-2323 (facsimile

*Attorneys for Plaintiff*
ORCKIT CORPORATION